51 A.3d 673

Bryan C. HINEBAUGH

v.

The GARRETT COUNTY MEMORIAL HOSPITAL, et al.

No. 331, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Aug. 31, 2012.

2

**4**

Stuart A. Schadt, Towson, MD, for appellant.

Eric Rhoades (Nicholas G. Hallenback, Kelly H. Hibbert, on the brief) Rockville, MD, Matt Fogelson, Varner & Goundry, P.C., Frederick, MD, for appellee.

Panel: EYLER, DEBORAH S., ZARNOCH, and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

In the Circuit Court for Garrett County, Bryan C. Hinebaugh, the appellant, brought a medical malpractice action against P. Daniel Miller, D.O., Allegany Imaging, P.C. ("Alle-

gany"), H. Stan Lambert, M.D., James K. Benjamin, M.D., and Garrett County Memorial Hospital ("GCMH"), the appellees.[1] The court granted, without prejudice, motions to dismiss filed by the appellees, ruling that Mr. Hinebaugh's certificate of qualified expert ("Certificate") did not satisfy the requirements of the Maryland Health Care Malpractice Claims Act ("the Act"), Md.Code (1974, 2006 Repl.Vol.), sections 3–2A–01 *et seq.* of the Courts and Judicial Proceedings Article ("CJP").

Mr. Hinebaugh appeals, presenting five questions, which we have combined and rephrased, as follows:

Did the circuit court err in granting the appellees' motion to dismiss both on the substance of the motion and because discovery had not been conducted in the case?[2]

For the following reasons, we shall affirm the judgment of the circuit court.

---

1. The initials "D.O." after Dr. Miller's name stand for "Doctor of Osteopathy." Thus, Dr. Miller is a doctor of osteopathic medicine, not a medical doctor. Both doctors of osteopathic medicine and medical doctors are physicians under Maryland law and may be licensed to practice medicine by the State. Md.Code (1981, 2009 Repl.Vol.), section 14–101(g) of the Health Occupations Article.

2. The questions as posed by Mr. Hinebaugh are:
 I. Whether the trial court erred when it found that Dr. Mitcherling was not board certified in a related specialty as the Appellees.
 II. Whether the trial court erred when it found that Appellee, Dr. Miller, provided treatment to Appellant related to the area in which he is Board Certified.
 III. Whether the trial court erred when it found that Dr. Mitcherling has not taught medicine in the Appellees' specialty or a related field of health care.
 IV. Whether the trial court erred when it failed to recognize that Dr. Mitcherling, as a board certified oral and maxillofacial surgeon, is qualified to render an expert opinion as to the standard of care that is required to be employed while treating an individual in an emergent care setting who has suffered facial injuries due to trauma.
 V. Whether the trial court erred when it granted the Defendants' Motions to Dismiss prior to discovery having been conducted.

## FACTS AND PROCEEDINGS[3]

■ On August 12, 2006, Mr. Hinebaugh, then 22 years old and incarcerated at a local jail, was hit in the face, sustaining injuries to his left cheek and jaw. He was seen by Dr. Miller, a family medicine doctor, and was transported to GCMH. Dr. Miller ordered simple x-rays of Mr. Hinebaugh's facial bones.[4] The x-rays were performed at GCMH and were evaluated by Dr. Miller and by Drs. Benjamin and Lambert, both of whom are radiologists. The radiological report of the x-rays, which was prepared based on the reviews by Drs. Benjamin and Lambert, stated that there were no radiographic abnormalities of Mr. Hinebaugh's facial bones.

In the days that followed, Mr. Hinebaugh still was in pain and was experiencing "numbness in the area of his left cheek." On August 17, 2006, he again was seen by Dr. Miller.[5] Dr. Miller did not render any additional treatment or order any further tests.

Ten days after that, on August 27, 2006, Mr. Hinebaugh, having been released from jail, went to the GCMH emergency room, where he was seen by Dr. Robert Coughlin, who, like Dr. Miller, is a family medicine doctor. Mr. Hinebaugh complained that ever since the day of the assault he had been experiencing numbness and pain in the area of his left cheek

---

**3.** The facts recited in this opinion are gleaned from Mr. Hinebaugh's complaint and the documents submitted in support of and in opposition to the motion to dismiss. Although submission of evidence beyond the four corners of the complaint ordinarily will convert a motion to dismiss into a motion for summary judgment, that is not so when the motion to dismiss concerns the validity of a certificate of qualified expert. *Breslin v. Powell*, 421 Md. 266, 288–94, 26 A.3d 878 (2011).

**4.** In his complaint, Mr. Hinebaugh alleges that he was seen by Dr. Miller on August 12, 2006, at GCMH. In its motion to dismiss, GCMH maintains that Mr. Hinebaugh was seen by Dr. Miller that day either at Dr. Miller's office or at the jail; and then was transported to GCMH and taken directly to the radiology department for x-rays per Dr. Miller's order. As we shall explain, this dispute is not material to the issues on appeal.

**5.** The complaint does not state where this follow-up visit took place.

and pain in his left jaw, which was worse when he chewed. He reported that the pain was increasing.

After reviewing the chart and seeing that simple x-rays had been performed on August 12, 2006, and that they "were felt to be normal," Dr. Coughlin ordered a maxillofacial CT scan. He read the CT scan himself. It showed "a left supraorbital fracture with displacement." Dr. Coughlin prescribed pain medication for Mr. Hinebaugh and urged him to be seen that week either by Dr. Villanueva, an Ear Nose and Throat ("ENT") doctor, or Dr. Strauss, an Oral and Maxillofacial Surgeon ("OMS"), for follow-up treatment.[6] It is unclear from the complaint exactly what follow-up treatment occurred, although Mr. Hinebaugh underwent surgery.

On August 12, 2009, Mr. Hinebaugh filed a medical negligence claim in the Health Care ADR Office ("HCADRO") naming Drs. Miller, Lambert, and Benjamin as defendant health care providers. He alleged that the doctors had breached the standard of care by failing to timely perform a CT scan of his face; failing to obtain appropriate consultations; failing to timely diagnose and treat his condition; failing to timely order and interpret the proper tests and procedures and to render follow up care; failing to inform him that more experienced or competent physicians were available to diagnose and treat his condition; and failing to inform him of past instances of not properly rendering care to patients and past bad outcomes. Mr. Hinebaugh further alleged that, as a consequence of the breaches in the standard of care by the appellees, he was required to undergo "extensive intrusive surgical procedures." He sought recovery for medical expenses, lost wages, future lost earnings, household expenses, and emotional pain and suffering.

On March 15, 2010, after receiving several extensions of time, Mr. Hinebaugh filed a three-page Certificate and one-page report by John Mitcherling, D.D.S. The Certificate states in pertinent part, that:

---

6. The first names of these doctors do not appear in the record.

- Dr. Mitcherling is licensed as a doctor of dental surgery, specializing in OMS.
- Within the five years prior to Mr. Hinebaugh's injury, Dr. Mitcherling had "clinical experience, provided consultation relating to clinical practice or taught medicine in the same speciality or a related field of health care as" Drs. Miller, Lambert, and Benjamin.
- Upon review of Mr. Hinebaugh's medical records, Dr. Mitcherling formed the opinion that the defendant health care providers had breached the standard of care in their treatment of Mr. Hinebaugh and that those breaches were the proximate cause of the injuries to Mr. Hinebaugh.
- Specifically, the defendant health care providers had breached the standard of care by "failing to timely perform a CT scan of [Mr. Hinebaugh's] face and by failing to completely diagnose, evaluate and treat his condition when he was seen at [GCMH] on August 12, 2006." Due to the breaches, "there was a significant delay in diagnosis of the condition and as a result there was a significant delay in any efforts to treat [Mr. Hinebaugh]'s condition." If the facial fractures had been timely diagnosed, Mr. Hinebaugh would not have required "extensive, intrusive surgical procedures."
- Dr. Mitcherling opined that the defendant health care providers also "departed from the standard of care by failing to employ appropriate diagnostic tests and procedures to evaluate and diagnose Mr. Hinebaugh's condition, failing to employ appropriate treatment, procedures and/or surgery to correct such condition, failing to appropriately monitor and evaluate Mr. Hinebaugh's condition, failing to adjust Mr. Hinebaugh's treatment in response to appropriate evaluation of the effects of treatment, and were otherwise negligent." Dr. Mitcherling further opined that the "departures from the standard of care were the proximate cause of injury to Bryan Hinebaugh."

Dr. Mitcherling's report sets forth the same opinions, in a more abbreviated fashion.

On May 26, 2010, Drs. Miller, Lambert, and Benjamin elected to waive arbitration. The HCADRO issued an order waiving arbitration on June 1, 2010. On July 26, 2010, in the Circuit Court for Garrett County, Mr. Hinebaugh filed a complaint alleging medical malpractice against Drs. Miller, Lambert, and Benjamin, and also against GCMH and Allegany. In his complaint, Mr. Hinebaugh made the same allegations of deviations from the standard of care he had made in his complaint in the HCADRO, and likewise alleged that the breaches had caused him to suffer injuries. His allegations against GCMH and Allegany were based solely upon vicarious liability.[7]

On October 14, 2010, Drs. Miller, Benjamin, and Lambert, together with Allegany, filed a joint motion to strike Dr. Mitcherling's Certificate and to dismiss the complaint without prejudice for failure to file a Certificate satisfying the requirements of the Act. As exhibits, they attached Mr. Hinebaugh's ADR claim form, the order waiving arbitration, and the Certificate. On October 15, 2010, GCMH filed a similar motion. It attached as exhibits the complaint, the Certificate, and print-outs from the Maryland Board of Physicians. The print-outs show that Dr. Miller is board certified in family medicine and that Drs. Lambert and Benjamin are board certified in radiology.

On November 1, 2010, Mr. Hinebaugh filed an opposition to the motions. In addition to the same exhibits furnished by the appellees, he attached Dr. Mitcherling's 30–page Curriculum Vitae and a printout from the American Board of Medical Quality, which certifies dentists and medical doctors "in the science and management of improving clinical processes and outcomes in systems that service and deliver health care." The printout shows that Dr. Mitcherling is certified by that board. Dr. Mitcherling's Curriculum Vitae reflects that he received his doctor of dental surgery degree in a three-year

---

7. Allegany is a radiology group that, allegedly, employed Drs. Benjamin and Lambert. It appears that GCMH was sued as the alleged employer of Dr. Miller and Drs. Benjamin and Lambert.

course of study from the University of Maryland Dental School, and, after two years of military service, went on to earn a post-doctoral degree in OMS in a three-year course of study at the Carle Foundation Hospital in Urbana, Illinois. His entire dental career has been devoted to the practice of OMS.

On November 9, 2010, GCMH filed a reply memorandum. On February 7, 2011, Mr. Hinebaugh filed a surreply and supplement to his opposition, attaching: 1) an affidavit by Dr. Mitcherling; 2) a Maryland Board of Physicians printout showing that Dr. Coughlin, who treated Mr. Hinebaugh at GCMH on August 27, 2006, is board certified in family medicine; and 3) GCMH records of his treatment by Dr. Coughlin that day.

In his affidavit, Dr. Mitcherling attested that he is board certified in OMS by both the Maryland State Board of Dentistry and the American Association of Oral and Maxillofacial Surgeons; that he has privileges to practice at Good Samaritan Hospital, St. Agnes Hospital, Maryland General Hospital, Greater Baltimore Medical Center ("GBMC"), Union Memorial Hospital, Upper Chesapeake Medical Center, Saint Joseph's Hospital, and Mercy Medical Center; that he is Chief of OMS at Good Samaritan and Maryland General Hospitals; and that he is on the "Resident Teaching Staff" at GBMC, Maryland General Hospital, and St. Agnes Hospital.

Dr. Mitcherling further averred that the health care field of OMS is one of only three in which health care providers "diagnose and treat facial fractures caused by traumatic injuries," the other two being plastic surgery and otolaryngology (ENT). He also attested that "[n]either family doctors nor radiologists are qualified to treat facial fractures caused by traumatic injuries." He explained that within the five years prior to August 2006, he had "regularly diagnosed and treated individuals who suffered facial fractures caused by traumatic injuries." Also during that time, he had taught residents at GBMC, Maryland General Hospital, and St. Agnes Hospital "the clinical aspects of diagnosing and treating individuals who

have suffered facial fractures caused by traumatic injuries." He attested that those clinical aspects include "reviewing, analyzing and evaluating diagnostic studies such as x-rays and CT scans of the patient's injuries."

Dr. Mitcherling opined in his affidavit that it is the "normal protocol" when a patient presents to the emergency room "after suffering facial fractures caused by traumatic injuries" for the emergency room physician to consult with an OMS, plastic surgeon, or ENT "in order to diagnose and treat the patient" and, in that capacity, he has been "regularly called" to emergency rooms "on an emergent basis by emergency room personnel in order to diagnose and treat individuals who have suffered facial fractures caused by traumatic injuries." He further attested that it is his practice and the practice of other OMSs to review and analyze diagnostic studies such as x-rays and CT scans personally, rather than to rely upon emergency room physicians, radiologists, or other health care providers to do so. He averred that, as an OMS, he is qualified to render an opinion as to whether the appellees departed from the standard of care in their diagnoses and treatment of Mr. Hinebaugh, and he reiterated his opinion that those doctors indeed had breached the standard of care. Finally, he attested that he has "been qualified as an expert and ha[s] testified as an expert in court proceedings on multiple occasions in cases in which the issues involve the failure to properly diagnose and/or treat patients who have suffered facial fractures caused by traumatic injuries."

On February 4, 2011, the court held a non-evidentiary hearing on the motions to dismiss. Before discussing the court's ruling, we shall review for context the provisions in the Act that govern Certificates in medical malpractice cases.

Unless the defendant has admitted liability or the sole issue is informed consent, the plaintiff in a medical malpractice case must file a "certificate of a qualified expert" who "attest[s] to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury." CJP § 3–2A–04(b)(1)(i)1. The Certificate shall be accompa-

nied by "a report of the attesting expert." CJP § 3–2A–04(b)(3)(i). "Discovery is available as to the basis of the certificate." CJP § 3–2A–04(b)(3)(ii). If the plaintiff fails to file a valid Certificate, the claim shall be dismissed without prejudice. CJP § 3–2A–04(b)(1)(i)1.

CJP section 3–2A–02(c) is entitled "Establishing liability of health care provider; qualifications of persons testifying." Subsection (c)(2)(ii) sets forth the qualifications a health care provider must possess to sign a Certificate (or to give expert witness opinion testimony on the standard of care element of the tort of medical negligence at a hearing or trial). It states:

(ii)1. In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:

A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action; **and**

B. Except as provided in subsubparagraph 2 of this subparagraph, if the defendant is board certified in a specialty, shall be board certified **in the same or a related specialty** as the defendant.

2. Subsubparagraph 1B of this subparagraph does not apply if:

A. The defendant was providing care or treatment to the plaintiff unrelated to the area in which the defendant is board certified; **or**

B. The health care provider taught medicine in the defendant's specialty or a related field of health care.

(Emphasis added.)

In their motions to dismiss, the appellees argued that Dr. Mitcherling does not meet the "same or related specialty"

board certification prerequisite in CJP subsubparagraph 3–2A–02(c)(2)(ii)1B; and that neither of the exceptions to that prerequisite, as set forth in CJP section 3–2A–02(c)(2)(ii)2A and B, apply. Therefore, Dr. Mitcherling was not qualified to submit a valid Certificate attesting to breaches of standards of care by Drs. Miller, Lambert, or Benjamin.[8] They maintained that for these reasons the Certificate was a nullity. With no valid Certificate having been filed, Mr. Hinebaugh's medical malpractice claims had to be dismissed, without prejudice, pursuant to CJP section 3–2A–04 (b)(1)(i)1. *See also Breslin v. Powell, supra.*

In his opposition to the motions to dismiss, Mr. Hinebaugh asserted that, although Dr. Mitcherling is not board certified in the same specialties as the appellees, he is board certified in a "related specialty"; and that, even if Dr. Mitcherling is not board certified in a "related specialty," he is qualified to sign a Certificate under the exceptions set forth in CJP section 3–2A–02(c)(2)(ii)2A and B, as, with respect to Dr. Miller, Dr. Miller was providing treatment to Mr. Hinebaugh unrelated to family medicine, and because he (Dr. Mitcherling) "taught medicine in the defendant[s'] specialty or a related field of health care."

The court heard argument of counsel on the motions to dismiss and on March 24, 2011, issued a memorandum opinion and order granting the motions without prejudice. The court found that Dr. Mitcherling is not board certified in "the same or a related specialty" as any of the defendants and that neither of the exceptions to that requirement applied. Focusing first on the "board certified in the same or a related specialty" requirement in (c)(2)(ii)1B, the court framed the central issue as "whether [OMS] is a speciality that is related to radiology or family medicine." Using dictionary definitions, the court determined that a "related" field or speciality is one

---

**8.** Because Dr. Mitcherling had attested that he had clinical and teaching experience in the field of health care in which the defendants provided treatment to Mr. Hinebaugh, the appellees did not argue below, and do not argue on appeal, that Dr. Mitcherling did not meet the prerequisite of CJP section 3–2A–02(c)(2)(ii)1A.

that is "connected." Pointing out that the Act does not "delineate the extent of this connection," the court reasoned that, in light of the purpose of the Act, which is to "screen malpractice claims" and "ferret out meritless ones," *Adler v. Hyman,* 334 Md. 568, 575, 640 A.2d 1100 (1994), " 'a related speciality' must be something more circumscribed than merely another type of health care practice."

The court took judicial notice of certain facts about each of the health care specialities at issue: OMS, family medicine, and radiology. These facts were drawn from definitions in the Maryland Code and COMAR, and publications by the American Medical Association, the American Dental Association, the Bureau of Labor Statistics, the American Board of OMS, the American Board of Family Medicine, the American Academy of Family Physicians, the American Board of Medical Specialties, and several schools of medicine.[9] The court contrasted the highly specialized training and expertise of OMS dentists, who treat the bones and soft tissues of the mouth, neck, and jaw, with the training and expertise of family medicine doctors, who treat the entire body and all aspects of a patient's

---

9. The court relied on definitions of "dentist" found in the AMERICAN HERITAGE DICTIONARY 230 (3d ed.1994); COMAR section 10.09.05.01; the website of the American Dental Association ("ADA"), www.ada.org; and an occupational outlook handbook published by the Bureau of Labor Statistics ("the occupational outlook handbook"), www.bls.gov/ ooh. The court gleaned definitions of OMS from the websites of the ADA, www.ada.org; the American Board of OMS, www.aboms.org; and the occupational outlook handbook. The court accepted definitions of "physician" and "doctor of osteopathic medicine" from the website of the American Medical Association, www.ama-assn.org. For a definition of "family medicine," the court referred to Md.Code (1978, 2008 Repl.Vol., 2011 Cum.Supp.), sections 18–702(a)(2) and 18–2801(e)(2) of the Education Article, as well as the websites of the American Board of Family Medicine, www.theabfm.org, and the American Academy of Family Physicians, www.aafp.org. The court used definitions of "radiology" from the AMERICAN HERITAGE DICTIONARY 680 (3d ed.1994), and the websites of the American Board of Medical Specialties, www.abms.org; the University of Maryland School of Medicine, www.medschool.umaryland.edu/radiology.asp; the Johns Hopkins School of Medicine, www.hopkinsradiology.org; the University of Chicago Medical Center, www.radiology.uchicago.edu; and the University of Virginia School of Medicine, www.medicine.virginia.edu/clinical/ departments/radiology.

physical and mental health. With respect to the radiologists, the court emphasized the specialized nature of diagnostic radiological training and practice.

The court took into account Mr. Hinebaugh's argument that Dr. Mitcherling has " 'vast and broad' experiences in the fields of anesthesiology, laser medicine, forensics, pain management, osseointegration, oral implantology, and medical quality management." Nevertheless, the court opined that permitting a dentist to offer an expert opinion as to whether a physician adhered to the standards of care in his speciality of family medicine or radiology would be inconsistent with the purpose of the Act. The court concluded that in this case the respective fields and specialties of the health care providers are not sufficiently related to allow "[Mr. Hinebaugh's] expert to express an opinion regarding the defendants' standards of care and any alleged breach thereof [as that] would not foster the Act's goal of decreasing the likelihood of the filing of meritless claims."

In reasoning that the specialty of OMS is not "sufficiently related" to the specialties of family medicine or radiology, so as to satisfy CJP section 3–2A–02(c)(2)(ii)1B, the court remarked that "the relatedness required by CJ[P] § 3–2A–02(c)(2)(ii) is not the relationship of the expert's specialty to the type of treatment the plaintiff received, but rather the relatedness of the expert's speciality to the defendants' area of expertise." The court decided that, although, as a specialist in OMS, Dr. Mitcherling would have been qualified to order and interpret radiological studies of Mr. Hinebaugh's face and to treat the injury he had suffered, including performing surgery to correct the injury, he was not qualified to opine about the standards of care that govern family medicine doctors and radiologists in diagnosing and treating patients presenting with the history and symptoms that Mr. Hinebaugh did. The court observed that, even though the "component" tasks performed by an OMS are similar to some of the "component" tasks performed by a family medicine doctor or a radiologist, that does not mean that the board certification specialties are "related," as is required by CJP section 3–2A–02(c)(2)(ii)1B

(assuming that the specialties are not certified by the same board).

The court further ruled that neither exception to the "same or related" board certification requirement applied in this case. It concluded that Dr. Miller had treated Mr. Hinebaugh within his specialty (family medicine) so the exception in subsubparagraph (c)(2)(ii)2A was not implicated; and Dr. Mitcherling had not "taught medicine in . . . a related field of healthcare," so the exception in subsubparagraph (c)(2)(ii)2B did not apply. With respect to the latter exception, the court determined that, although Dr. Mitcherling had taught OMS in OMS and dental departments and also in surgery departments of hospitals, the specialty of surgery was not related to the defendants' specialties; and, in any event, Dr. Mitcherling had not taught general surgery, because he is not a physician.

Mr. Hinebaugh noted a timely appeal to this Court from the order dismissing his complaint.

### DISCUSSION

Mr. Hinebaugh contends the circuit court erred as a matter of law in ruling that Dr. Mitcherling was not qualified to sign a Certificate in this case and that his Certificate therefore was a nullity. He asserts that the court did not properly interpret the board certification in a "related specialty" language in CJP section 3–2A–02(c)(2)(ii)1B; and that, under a proper interpretation of that language, OMS is a "related specialty" to both family medicine and radiology. Accordingly, Dr. Mitcherling satisfied the board certification requirement of the statute that applies when the defendant health care provider is board certified, as the defendants in this case are.

Mr. Hinebaugh further argues that, even if Dr. Mitcherling is not board certified in a "related specialty" to the board certification specialties of the defendant health care providers, the exceptions to that requirement set forth in subsubparagraph 3–2A–02(c)(2)(ii)2 A and B apply. He maintains that the court failed to properly interpret the language of the exceptions. Specifically, he argues that Dr. Miller was prac-

ticing emergency medicine, not family medicine, when he committed the alleged acts of negligence, so exception 2A applied to him; and that, as to all three defendants, Dr. Mitcherling has "taught medicine" in a "field of health care" that is "related" to family medicine and radiology, so exception 2B applied to them as well.

As an alternative contention, Mr. Hinebaugh asserts that the court prematurely ruled on whether Dr. Mitcherling was qualified to sign a Certificate because the Act expressly allows for discovery into the basis for a Certificate, but discovery was not conducted.

 Whether a Certificate and report of attesting expert are satisfactory under CJP section 3–2A–01 *et seq.* "is a determination to be made as a matter of law." *Carroll v. Konits*, 400 Md. 167, 180 n. 11, 929 A.2d 19 (2007). "[D]is-missal is only appropriate if, after assuming the truth of the assertions in the Certificate and report, and all permissible inferences emanating therefrom, the requirements set forth in the [Act] are not satisfied." *Id.* Likewise, a question of statutory interpretation is one of law. *See, e.g., Univ. of Md. Med. Sys. Corp. v. Waldt*, 411 Md. 207, 222, 983 A.2d 112 (2009). As always, on pure issues of law, our standard of review is *de novo. See, e.g., Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175 (2006).

### Is Dr. Mitcherling, A Board Certified OMS, Board Certified In The "Same or Related Specialty" As The Defendant Health Care Providers?

Recently, in *DeMuth v. Strong*, 205 Md.App. 521, 45 A.3d 898 (2012), we applied the well-established principles of statutory construction to determine the meaning of the phrase "related specialty" in CJP section 3–2A–02(c)(2)(ii)1B.[10] We

---

**10.** Until *DeMuth* was decided, the meaning of "related specialty" in the statute at issue had not been addressed by an appellate court in Maryland. In the circuit court's memorandum opinion in the case at bar, it discussed this Court's opinion in *Powell v. Breslin*, 195 Md.App. 340, 6 A.3d 360 (2010), in which the circuit court granted summary

reasoned that the word "related," considered in the context of both subsubparagraph 1A, in which it modifies "field of health care," and subsubparagraph 1B, in which it modifies "specialty," has its ordinary plain dictionary meaning of "associated" or "connected." *Id.* at 535–36, 45 A.3d 898. Taking into account the purpose of the Act, which is to weed out non-meritorious medical malpractice claims but not to create road-blocks to the pursuit of meritorious medical malpractice claims, we concluded that fields of health care are "related," and hence board certified specialties are "related," when there is an overlap in treatment or procedures within the specialties and therefore an overlap of knowledge of treatment or procedures among those experienced in the fields or practicing in the specialties, and the treatment or procedure in which the overlap exists is at issue in the case.

We held in *DeMuth* that a board certified vascular surgeon was qualified to give standard of care opinion testimony against the defendant board certified orthopedic surgeon because the treatment, or failure to treat, at issue took place in the postoperative period of a patient who underwent knee replacement surgery, and concerned proper monitoring and testing of the patient to assure that there was adequate blood flow to his leg. Orthopedic surgeons and vascular surgeons all are specialists who diagnose, treat, and are familiar with

---

judgment in favor of a defendant vascular surgeon because the plaintiff's certificate of qualified expert was signed by an anesthesiologist. On appeal, the plaintiff/appellant did not challenge the substance of the circuit court's ruling. Rather, he only challenged the remedy, arguing that the court should have dismissed the case without prejudice instead of granting summary judgment. We held that it was not proper to grant summary judgment. The Court of Appeals granted *certiorari* on that issue, and affirmed. *Breslin v. Powell, supra,* 421 Md. 266, 26 A.3d 878. Thus, neither the holding of this Court nor the holding of the Court of Appeals in *Powell* addressed the question whether the anesthesiologist had been qualified *vel non* to sign the certificate of qualified expert against the vascular surgeon. Indeed, referencing the underlying procedural background, the Court of Appeals commented that it did not need to "consider, in the present case, whether an anesthesiologist would be unqualified wholly in every case to attest, in a Certificate or in testimony, to the standard of care (and breach thereof) provided by a vascular surgeon." 421 Md. at 275 n. 11, 26 A.3d 878.

the standards of practice that apply to the postoperative care of patients as relevant to adequate blood flow. In that regard the specialties overlap, and thus are connected or associated within the meaning of CJP section 3–2A–02(c)(2)(ii)1B.

In *DeMuth*, although the defendant and the expert witness testifying against him were board certified in different, although in some aspects related, specialties, both were physicians. In the case at bar, the certifying expert witness is a dentist, not a physician. The appellees maintain that the fact that Dr. Mitcherling is a dentist, not a physician, renders him unqualified to opine, in a Certificate, that the physician defendants departed from the standard of care in their treatment of Mr. Hinebaugh. In effect, they argue that dentistry is not a field or specialty of health care that is related to medical fields or specialties of health care, and therefore board certification in dentistry can never be "related to" board certification in a medical specialty.

Under CJP section 3–2A–02, of which 1B is a part,

[a]ll claims, suits, and actions, including cross claims, third-party claims, and [wrongful death] claims, by a person against a health care provider for medical injury allegedly suffered by the person in which damages of more than the limit of the concurrent jurisdiction of the District Court are sought are subject to and shall be governed by the provisions of [the Act].

CJP § 3–2A–02(a). The definition of "health care provider" in the Act is expansive, including virtually every type of health care practitioner and facility licensed or authorized to provide health care services in this state. CJP § 3–2A–01 (f).[11] Phy-

---

**11.** The definition reads as follows:

"Health care provider" means a hospital, a related institution ..., a medical day care center, a hospice care program, an assisted living program, a freestanding ambulatory care facility ..., a physician, an osteopath, an optometrist, a chiropractor, a registered or licensed practical nurse, a dentist, a podiatrist, a psychologist, a licensed certified social worker-clinical, and a physical therapist, licensed or authorized to provide one or more health care services in Maryland.

sicians, osteopaths, and dentists all are "health care providers" under the Act.[12]

It is undisputed that Dr. Mitcherling is a dentist who specializes in OMS, and that he is board certified to practice in the specialty of OMS by the American Board of Oral and Maxillofacial Surgeons. Thus, he is a health care provider, and he is board certified in a specialty. Likewise, the defendant physicians are health care providers who are board certified in specialties—Dr. Miller in family medicine and Drs. Lambert and Benjamin in radiology.

■ A plain reading of the language of CJP section 3–2A–02 leads us to conclude that it is not necessary for a certifying or testifying expert witness in a medical malpractice case to be the same kind of health care provider as the defendant, *i.e.*, that they both be dentists, both be physicians, both be podiatrists, etc. Subsection (c) of CJP section 3–2A–02, entitled *"Establishing liability of health care provider; qualifications of persons testifying,"* provides at subparagraph (1) that the health care provider defendant only will be liable if "it is established that the care given by the health care provider is not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities...." That statute does not require that the applicable standards of practice be established by an expert witness in the same health care profession as the defendant.

Nor do the prerequisites for a person to sign a certificate of qualified expert or testify concerning "a defendant's compliance with or departure from standards of care" include any words to the effect that the attesting or testifying expert must be a member of the same health care profession as the defendant. CJP § 3–2A–02(c)(2). The only prerequisites are that the certifying or testifying expert be a "health care provider," "have had clinical experience, provided consultation

12. As noted previously, osteopaths are physicians under section 14–101(g) of the Health Occupations Article.

relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff" within a specified period of time, and "be board certified in the same or a related specialty as the defendant" if the defendant is board certified in a specialty. CJP §§ 3–2A–02(c)(2)(ii)1A and B. Thus, the plain language of the statute requires that the expert witness signing the certificate or testifying be a "health care provider" but does not require that the expert and the defendant be the same kind of health care provider. Accordingly, the mere fact that Dr. Mitcherling is a dentist and the defendants are physicians did not disqualify Dr. Mitcherling from signing a valid Certificate in this case.[13]

---

**13.** In *Tompkins v. Bise,* 259 Kan. 39, 910 P.2d 185 (1996), the Kansas Supreme Court held that, under that state's statute governing medical malpractice suits, a dentist specializing in OMS could give an expert opinion at trial about the standard of care applicable to a surgeon who was trained in OMS and performed OMS procedures. The governing statute required that an expert testifying against a medical doctor in a malpractice case devote at least "50% of [his or her] professional time within the two-year period preceding the incident . . . to actual clinical practice *in the same profession in which the defendant is licensed." Id.* at 43, 910 P.2d 185 (quoting K.S.A. § 60–3412) (emphasis added). The defendant physician had been trained in surgery, plastic surgery, and cranial maxillofacial surgery; also, before attending medical school, he had graduated from dental school and had practiced dentistry. His license to practice dentistry in Kansas was inactive. He had operated on the plaintiff to repair two jaw fractures suffered in a motorcycle accident.

After the plaintiff experienced complications from the surgery, he brought suit for medical malpractice against the defendant physician and designated an OMS dentist as his expert witness on the standard of care. The defendant filed a motion to strike the OMS dentist as an expert witness, arguing that dentistry and medicine are different "professions," as they are licensed by different state boards, and therefore, pursuant to K.S.A. section 60–3412, the OMS dentist was not qualified to testify against him. The trial court disagreed and allowed the OMS dentist to testify at trial. The OMS dentist opined that the physician defendant was performing OMS when he operated on the plaintiff, and that the way in which the surgery was performed by the defendant physician departed from the standard of care for an OMS. Specifically, the expert OMS dentist testified that the defendant physician should have performed an open, rather than a closed, reduction, and, had he done so, problems the plaintiff experienced with a muscle pull in the

Having determined that the governing statute did not preclude Dr. Mitcherling, as a dentist, from issuing a Certificate attesting to departures from the standard of care by the appellee physicians, and because the appellee physicians all are board certified in specialties, we move to the question whether Dr. Mitcherling is board certified in a "related specialty" vis a vis the appellee physicians. (Clearly, he is not board certified in the "same specialty" as any of them.)

As explained above, in *DeMuth* we held that a "related specialty" for purposes of the board certification requirement in CJP section 3–2A–02(c)(2)(ii)1B, is one in which, as pertinent to the treatment or procedure at issue, there is an overlap between the specialties in the rendering of treatment or the performance of procedures, such that there also is an overlap of knowledge of the treatments and procedures among those health care providers certified in either specialty. In *DeMuth*, the evidence showed a treatment overlap between board certified orthopedic surgeons and board certified vascular surgeons with respect to the postoperative management of orthopedic patients. Specifically, board certified orthopedic surgeons and board certified vascular surgeons both engage in

jaw would have been resolved. The jury in the case returned a verdict in favor of the plaintiff.

On appeal, the Kansas Supreme Court agreed with the trial court's decision to allow the OMS dentist to testify as a standard of care expert against the physician defendant. The court rejected the argument that, because dentists and physicians are licensed by different boards, they cannot be practicing in the "same profession" under any circumstance, and therefore can never be qualified to testify as standard of care expert witnesses against each other. The court emphasized that, even though the defendant was a physician and the expert witness was a dentist, they "were both qualified to diagnose and treat [the plaintiff's] jaw injury." 259 Kan. at 47, 910 P.2d 185. The court observed that although the licensure of the defendant physician and the expert dentist differed, "both were trained in and practiced oral and maxillofacial surgery." *Id.* The court concluded that the expert witness had the requisite amount of actual clinical practice in the same profession in which the defendant physician was licensed—OMS—to satisfy the requirements of the statute. It noted that the fact that the testifying expert was a dentist went to the weight to be given to his testimony by the fact-finder, not to his qualification to testify.

the assessment of blood flow to the extremities of a patient who just has undergone an orthopedic operation.

We concluded that, within that overlap area of treatment, the specialties were "related." They would not be related with respect to the performance of surgeries within the specialties. Ordinarily, vascular surgeons do not perform orthopedic surgeries, and therefore vascular surgery is not a related specialty, for purposes of the board certification requirement, when the standard of care issue in a medical malpractice case is whether an orthopedic surgeon properly performed a particular orthopedic surgery, such as the knee replacement operation the plaintiff underwent in *DeMuth.* Likewise, orthopedic surgeons ordinarily do not perform vascular surgeries, and therefore orthopedic surgery is not a related specialty for purposes of the board certification requirement when the standard of care issue is whether a vascular surgeon properly performed a particular vascular surgery operation or procedure. When, as in *DeMuth,* however, the treatment rendered is performed by both specialists and therefore is within the overlapping expertise of two board specialty areas, so that both board certified specialists should be equally knowledgeable and competent to testify about the prevailing standard of care for a health care provider board certified in either specialty, the specialties are "related" and opinions about the standard of care may be given by either board certified specialist.

■ With the holding of *DeMuth* in mind, we consider whether the specialties of family medicine (Dr. Miller) and OMS (Dr. Mitcherling) and the specialties of radiology (Drs. Lambert and Benjamin) and OMS (Dr. Mitcherling) are "related" in the context of the diagnosing, on a front line basis, of the medical condition of a patient who has been hit in the face by another person and is experiencing pain.

The certifying authority for the specialty of family medicine is the American Board of Family Medicine, originally named the American Board of Family Practice. As the website for

the board explains, although family medicine is a "specialty," it has its roots in general, not special, practice:

> Various studies in the 1950s and 1960s concluded that "General Practice" was moribund. An analysis was made of specialty distribution of all graduates of every medical school by five-year periods since 1900 and from this data it was learned that the number of general practitioners was rapidly and steadily declining.
>
> * * *
>
> The general response to this precipitous decline was "this is an age of specialization." The founders of the Board could only affirm this fact, believing that this response to the dearth of General Practitioners strengthened their argument for a new **generalist-specialist type of specialty** called "Family Practice."
>
> * * *
>
> The specialty of Family Practice, based on the heritage of General Practice, would have graduate programs (residencies) for physicians whose training would encompass 1) first-contact care; 2) continuous care; 3) comprehensive care; 4) personal care (caritas); 5) family care; and, 6) competency in scientific general medicine.

www.theabfm.org/about/history.aspx. (Emphasis added.) Thus, family medicine as a board specialty is an outgrowth of general practice, and, although a specialty, in that there is a residency training program in family medicine and a physician may become board certified in the field, it is in the nature of general practice, that is, a "generalist-specialist type of specialty."

The certifying authority for radiology is the American Board of Radiology, which has existed in various iterations since the 1930s. *See* www.theabr.org. The board certifies practitioners in various radiology specialties, including most prominently diagnostic radiology and radiation oncology.[14]

---

**14.** The areas of radiology specialties for which the American Board of Radiology issues initial and maintenance board certificates are diagnos-

OMS is a highly specialized field of dental surgery. In his affidavit, Dr. Mitcherling attests that

> [t]he field of [OMS] is one of only three fields of medicine that diagnose and treat facial fractures caused by traumatic injuries. In addition to oral and maxillofacial surgeons, plastic surgeons and ear nose and throat specialists treat facial fractures caused by traumatic injuries although such injuries are most commonly treated by oral and maxillofacial surgeons. Neither family doctors nor radiologists are qualified to treat facial fractures caused by traumatic injuries.

When Dr. Miller saw Mr. Hinebaugh on August 12, 2006 (regardless of whether the visit was at Dr. Miller's office, the jail, or the hospital), Dr. Miller was engaged in the family medicine practice of "first-contact care," that is, he was on the front line, assessing Mr. Hinebaugh's complaint of pain caused by having been hit in the face. He ordered simple x-rays of Mr. Hinebaugh's face to determine whether there were fractures of the facial bones. The x-rays were performed and read by Drs. Benjamin and Lambert who, in assessing the results of the simple x-rays to determine whether they revealed any damage to the bones of Mr. Hinebaugh's face, were practicing diagnostic radiology. Drs. Benjamin and Lambert, and Dr. Miller, all concluded that the simple x-rays did not show any fractures to the bones of Mr. Hinebaugh's face.

The single specifically stated standard of care opinion given by Dr. Mitcherling in his Certificate is that all three defendants breached the standard of care on August 12, 2006, by failing to perform a CT scan of Mr. Hinebaugh's face.[15] Dr. Mitcherling **did not opine** (either in the Certificate and report, or in his affidavit in opposition to the motion to dismiss)

---

tic radiology, radiation oncology, medical physics, neuroradiology, nuclear radiology, pediatric radiology, and vascular/interventional radiology. www.theabr.org.

**15.** The report by Dr. Mitcherling attached to his Certificate contains general allegations; the Certificate is the only document that alleges a specific breach in the standard of care.

that any of the defendants breached the standard of care by ordering simple x-rays of Mr. Hinebaugh's face. Likewise, **he did not opine** that the simple x-rays of Mr. Hinebaugh's face showed a fracture of the facial bones that Drs. Miller, Benjamin, and Lambert failed to detect. Any such opinion would have to have been stated by Dr. Mitcherling in his Certificate and report, or at least in the affidavit he furnished in opposition to the motion to dismiss. *See Carroll v. Konits,* 400 Md. 167, 201, 929 A.2d 19 (2007) (holding that certifying expert is required to state specifically in his certificate of qualified expert and report the departures from the standard of care of the defendant, or each defendant, that caused the injuries for which liability is sought).

Thus, the question we must answer is narrowed to whether OMS is related to family medicine and/or radiology with respect to whether either such doctor breached the standard of care in his own specialty by not ordering a CT scan of the facial bones of a patient who was hit in the face, after simple x-rays of the face did not show any broken bones. We conclude from Dr. Mitcherling's affidavit that the specialties are not so related: Under circumstances such as those in this case, the areas of knowledge and experience of board certified family medicine and radiology doctors do not overlap the areas of knowledge and experience of board certified OMS dentists.

On the topic of diagnosis of facial fractures, Dr. Mitcherling attested that as an OMS he "regularly diagnose[s] and treat[s] individuals who suffered facial fractures caused by traumatic injuries" and that he has regularly taught "the clinical aspects of diagnosing and treating" facial fractures to residents in the programs he runs. The information furnished by Dr. Mitcherling makes clear that the programs he runs are for residents training in OMS—not for residents training in family medicine or radiology. The fact that, as an OMS, he diagnoses and treats facial fractures, and teaches OMS trainees how to do so, does not show that there is an overlap between OMS and family medicine or OMS and radiology. Indeed, it does not show any knowledge or experience on the part of Dr. Mitcherling, as an OMS, of the standard of care that applies to family

medicine doctors or radiologists confronted with a patient who complains of pain as the result of being hit in the face.

Dr. Mitcherling further attests that in his experience "it is the normal protocol when a patient is brought to the emergency room of a hospital *after suffering facial fractures caused by traumatic injuries* for the emergency room personnel to consult with an [OMS], plastic surgeon, or [ENT] in order to diagnose and treat the patient." (Emphasis added.) He asserts that in his capacity as an OMS he is regularly called to emergency rooms on an emergency basis "in order to diagnose and treat individuals *who have suffered facial fractures* caused by traumatic injuries." (Emphasis added.) These sentences clearly convey that Dr. Mitcherling's services as an OMS specialist primarily are sought out by doctors working on the front line once a facial fracture has been diagnosed. They do not convey that Dr. Mitcherling's services as an OMS specialist are sought out by front line doctors presented with a complaint by a patient of being hit in the face when a simple x-ray does not reveal any fracture.[16]

Moreover, Dr. Mitcherling's entire affidavit is devoted to explaining the standards of care that govern OMS dentists, and his knowledge of those standards. For example, he states:

> It is my practice, and it is the standard of practice **of other oral and maxillofacial surgeons,** to review, analyze and evaluate diagnostic studies such as x-rays and CT scans performed on patients during the course of the diagnosis and treatment of patients who have suffered facial fractures caused by traumatic injuries rather than rely solely on the opinions of emergency room personnel, radiologists, or other health care providers.

---

**16.** Indeed, that is the course of action that Dr. Coughlin took after the CT scan performed on August 27, 2006 revealed a facial fracture. (Unlike Drs. Miller, Benjamin, and Lambert, who were the first to see and assess Mr. Hinebaugh for his complaint of pain due to being hit on the face, Dr. Coughlin saw Mr. Hinebaugh after the pain in his face had continued for a period of weeks, and was worsening.)

(Emphasis added.) At no place in Dr. Mitcherling's Certificate or his affidavit does he attest to knowledge of the prevailing standard of care for family medicine doctors in diagnosing patients who present either in an emergency room, hospital clinic, or office setting with a complaint of an assault to the face and pain in the area of the assault, or to knowledge of the prevailing standard of care for radiologists in reviewing simple x-rays taken of the injured area of such a patient. Nor does he attest to the standard of care that applies to either such specialist when an x-ray of the afflicted area does not show a fracture. Specifically, he does not opine that the standard of care for either family medicine doctors or radiologists overlaps that of an OMS specialist, who, having been called in as a consultant—the only setting in which Dr. Mitcherling explains the standard of care for OMS dentists—looks beyond the result of simple x-rays and performs other tests to reach a diagnosis.

We agree with the circuit court that, once Mr. Hinebaugh's facial fractures were detected, Dr. Mitcherling was qualified to treat them, and indeed belonged to one of the few board certification specialties in which the members are so qualified. However, the standard of care issue in this case concerns the alleged failure of a family medicine doctor and two radiologists to diagnose facial fractures upon initial presentation of a patient. It is in that context that the "relatedness" or not of the specialties is assessed; and when it is, it is clear that OMS is not a "related specialty" to family medicine or radiology.

Any commonality between OMS and either family medicine or radiology with respect to the initial diagnosis of facial fractures does not exist on the same plane. OMS dentists are not front line health care providers. They are brought into a case upon referral or request of a front line health care provider, usually when a facial fracture diagnosis already has been made or sometimes when the involvement of a specialist in the diagnosis and treatment of facial fractures is needed. Family medicine doctors, radiologists, and OMS dentists all may examine and test patients for possible facial fractures, but they do not do so on an equal footing. Ordinarily, and it is the

case with the defendants here, family medicine doctors and radiologists do so as part of a general practice in which they see for initial examination and testing a wide spectrum of patients. For family medicine doctors and radiologists, the spectrum covers possible fractures of any of the bones of the body; and for family medicine doctors alone, the spectrum covers a myriad of symptoms that may signal a problem with any bodily system. OMS dentists examine and test patients as specialists whose area of practice only concerns facial fractures. Thus, the specialties do not overlap in that OMS dentists and family medicine and/or radiology doctors are not by education, training, experience, or competency on an equal footing with respect to the diagnosis and treatment of facial fractures in front line patients.

It would not be proper for a family medicine doctor or a radiologist, who is not an expert in the diagnosis of facial fractures in initially presenting patients, to express an opinion about the prevailing standard of care for an OMS. Likewise, it is not proper for an OMS dentist, who is such an expert, to express an opinion about the standard of care that governs a family medicine doctor or a radiologist in that situation. Under the test for "related specialty" set forth in *DeMuth v. Strong,* the circuit court properly ruled that Dr. Mitcherling was not qualified to furnish the Certificate and report in this case.

### *Does Either Exception To The Board Certification In The Same Or A Related Specialty Requirement Apply?*

As discussed, even when an expert witness does not satisfy the "same or related specialty" board certification requirement of CJP section 3–2A–02(c)(2)(ii)1B, if either of two exceptions to that requirement is satisfied, the expert nevertheless may express standard of care opinions about a health care provider who is board certified in a different or unrelated specialty. We must determine whether either such exception applies in this case.

■ The first exception, in subsubparagraph (ii)2A, is triggered when the defendant health care provider "was providing care or treatment to the plaintiff unrelated to the area in which the defendant is board certified." Mr. Hinebaugh maintains that Dr. Miller did not treat him in the area of family medicine, in which he is board certified, but in the area of emergency medicine, and therefore this exception applies.[17] We disagree. Whether Dr. Miller was treating Mr. Hinebaugh in the hospital, his office, or the jail, the nature of the treatment he was rendering was not outside the realm of family medicine. He was the first physician to see Mr. Hinebaugh, who was not *in extremis*. Mr. Hinebaugh reported that he had been injured when another person hit him in the face. Dr. Miller examined Mr. Hinebaugh and ordered x-rays, which were performed and read by radiologists, in an effort to determine whether the assault had caused a fracture or fractures to the bones in his face. This treatment is within the province of "first-contact care" family medicine.

■ The second exception, at subsubparagraph (ii)2B, applies when the certifying or testifying health care provider "taught medicine in the defendant's specialty or a related field of health care." There is nothing in Dr. Mitcherling's affidavit or any other document in the record before us to show that Dr. Mitcherling ever taught medicine in the specialty of family medicine or the specialty of radiology. In his Certificate, Dr. Mitcherling represented without any detail that he "had clinical experience, provided consultation relating to clinical practice **or** taught medicine in the same specialty or a related field of health care as that of the health care providers ... who provided care to Bryan Hinebaugh." (Emphasis added.) This non-specific assertion tracks precisely the requirement of CJP section 3–2A–02(c)(2)(ii)1A, which is not at issue here, because it is undisputed that Dr. Mitcherling gives consultations to doctors in other fields, such as family medicine and radiology. Given the "or" in the statutory language, the assertion is not a

_____

17. Mr. Hinebaugh does not argue that this exception applies to Dr. Benjamin or Dr. Lambert.

statement by Dr. Mitcherling that he has "taught medicine in the same specialty or a related field of health care" as that of the defendants in this case.

As discussed above, however, in his affidavit Dr. Mitcherling attested that he has "taught the clinical aspects of diagnosing and treating individuals who have suffered facial fractures caused by traumatic injuries to student residents of the hospitals [at which he is permitted to practice], which includes reviewing, analyzing and evaluating diagnostic studies such as x-rays and CT scans of the patient's injuries." This is a specific representation. It is insufficient, however, because the students he teaches are residents in OMS dentistry. They are not students in family medicine or radiology. There is nothing in Dr. Mitcherling's Certificate, report, or affidavit to show that he has taught in the specialties of family medicine or radiology, and, for the reasons we already have explained, OMS is not a related specialty to the specialties of family medicine or radiology, and therefore teaching in the specialty of OMS does not satisfy this exception.

For these reasons, neither exception to the requirement that the certifying expert witness be board certified in the same or a related specialty as the defendant or defendants applies.

### Did the Circuit Court Err In Dismissing The Complaint Because Discovery Had Not Been Conducted About The Basis For Dr. Mitcherling's Certificate?

 Finally, Mr. Hinebaugh contends the circuit court erred by ruling prematurely on whether Dr. Mitcherling's Certificate satisfied CJP section 3–2A–02(c)(2)(ii)1B, or either of the exceptions thereto, because the parties had not yet engaged in any discovery. He argues that "the issue of whether [Dr. Mitcherling] is qualified to render an opinion as to the allegations in [the] [c]omplaint that [the] [a]ppellees breached the standard of care can be further explored by the [a]ppellees." In particular, he relies upon CJP section 3–2A–04(b)(3)(ii), which states that "[d]iscovery is available as to the basis of the certificate [of qualified expert]." He also points

out that in *Powell,* the motion to dismiss was filed only after, during a discovery deposition, the plaintiff's expert witness against the defendant vascular surgeon acknowledged that he was not qualified to testify about the prevailing standard of care for a vascular surgeon.

■ These arguments are unavailing to Mr. Hinebaugh. Just because the parties have the opportunity to conduct discovery about the basis of a Certificate does not mean that a Certificate cannot be found to be invalid unless discovery has been conducted. Mr. Hinebaugh had access, without discovery, to all the information material to whether Dr. Mitcherling satisfied the necessary criteria to submit a valid Certificate against the defendants, most importantly, Dr. Mitcherling's training and experience, his board certification, the nature of his OMS practice, the board certification and practices of the defendant physicians, and the opinions Dr. Mitcherling had to offer. Indeed, in opposing the motion to dismiss, Mr. Hinebaugh submitted an affidavit by Dr. Mitcherling that set forth whatever facts and opinions counsel for Mr. Hinebaugh considered to be important to the validity of the Certificate. There was no discovery Mr. Hinebaugh needed, or that he argued he needed, to enable him to submit a Certificate by Dr. Mitcherling that was most likely to meet the statutory requirements or to enable him to adequately oppose the motion to dismiss. And whether the appellees wished to engage in discovery was up to them; and apparently they did not.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**